

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00434-CR

_____

ROBERT F. HALLMAN, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 1
Tarrant County, Texas
Trial Court No. 1548964R

Dissenting Opinion by Justice Womack

## DISSENTING OPINION ON REMAND

## I. INTRODUCTION

The majority[1] holds that the trial court abused its discretion by denying Appellant Robert F. Hallman's motion for mistrial and that the resulting harm affected his substantial rights. Therefore, the majority reverses the trial court's judgment and remands the case for a new trial.

The majority's disposition stems from thirteen pages of undisclosed discovery—and in particular Hallman's ex-wife's (Kim's) ten-line handwritten witness statement—from an *extraneous* incident that occurred over a year and a half before the initial outcry of sexual abuse in this case. This prior incident involved neither allegations of sexual abuse nor allegations of any kind against Hallman by the complainants (Rita and Amy) but instead involved Hallman's physical assault of his ex-wife and son (Ron). Hallman claims that lack of access to this discovery in the guilt–innocence stage deprived him of the opportunity to fully develop his defensive theory that his ex-wife and the complainants were lying. Because (1) the offense

---

[1]For ease of reference, I use the term "majority" to refer to the opinion authored by Justice Wallach in this case. I recognize, however, that in the concurring opinion authored by Justice Walker, Justice Walker notes that he "cannot join the majority opinion," although he does agree with the result of the judgment. *See* Tex. R. App. P. 41.1(a) ("A majority of the panel, which constitutes a quorum, must agree on the judgment."). Therefore, while there is a majority of the panel agreeing to the judgment, we may not have a "majority opinion." *See Unkart v. State*, 400 S.W.3d 94, 100 (Tex. Crim. App. 2013) ("An 'opinion of the Court' or 'majority opinion' is one that is joined by a majority of the judges participating in the case.").

report from the extraneous incident—containing essentially the same information as the written statement—was timely disclosed, (2) Hallman was able to successfully impeach his ex-wife's testimony through the investigating detective's testimony on the same issue, and (3) the great weight of the evidence—which involved twelve guilt–innocence stage witnesses over the course of an eight-day jury trial—supports the conviction, I would hold that the trial court did not abuse its discretion by denying the motion for mistrial and that Hallman's substantial rights were not affected by the trial court's denial of the motion for mistrial. Therefore, I respectfully dissent.

## II. THE APPROPRIATE ANALYSIS: *MOSLEY* OR RULE 44.2(B)?

In granting the State's petition for discretionary review, the Court of Criminal Appeals remanded this case to us "for further consideration and disposition consistent with *Watkins* [*v. State*, 619 S.W.3d 265 (Tex. Crim. App. 2021)]." *Hallman v. State*, 620 S.W.3d 931, 931–32 (Tex. Crim. App. 2021). As a preliminary matter, it is unclear how we should analyze Hallman's appeal. In his supplemental brief, Hallman argues that we should apply the harm analysis under Texas Rule of Appellate Procedure 44.2(a), requiring reversal unless it can be determined beyond a reasonable doubt that the error did not contribute to his conviction. *See* Tex. R. App. P. 44.2(a). The State counters that the proper harm analysis here is under Texas Rule of Appellate Procedure 44.2(b), requiring error to be disregarded if it does not affect Hallman's substantial rights. *See* Tex. R. App. P. 44.2(b). Alternatively, if the standard for reviewing the denial of a motion for mistrial applies, the State argues that the

3

three-factor test in *Mosley v. State* applies. 983 S.W.2d 249, 259 (Tex. Crim. App. 1998). The *Mosley* factors are: (1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the certainty of conviction absent the misconduct. *Id.* After discussing these various analyses, the majority applies the *Mosley* test to evaluate whether the trial court abused its discretion by denying Hallman's motion for mistrial.

However, it is not clear whether the use of the *Mosley* factors is appropriate for the issue raised in this appeal. The *Mosley* factors seem to be chiefly utilized in cases involving a motion for mistrial following improper argument by a prosecutor. *See, e.g.,* *Archie v. State*, 221 S.W.3d 695, 700 (Tex. Crim. App. 2007) (applying *Mosley* factors in case involving improper argument made by a prosecutor); *Hawkins v. State*, 135 S.W.3d 72, 75–76 (Tex. Crim. App. 2004) (same); *Mosley*, 983 S.W.2d at 259 (same); *see also Garcia v. State*, No. 10-12-00202-CR, 2013 WL 3482009, at *1 (Tex. App.—Waco July 11, 2013, pet. ref'd) (mem. op., not designated for publication) ("Because the Court of Criminal Appeals has not adopted the *Mosley*/*Hawkins* factors in evaluating the denial of a motion for mistrial pursuant to any reason other than improper argument . . . we do not use those factors in our review . . . .").

Indeed, when the Texas Court of Criminal Appeals established the *Mosley* factors, it noted that the factors had previously been applied by federal courts when addressing "improper argument cases." *Mosley*, 983 S.W.2d at 259. *Mosley* itself was an improper argument case, which can be seen in *Mosley*'s recitation of the first

4

factor: "severity of the misconduct (*the magnitude of the prejudicial effect of the prosecutor's remarks*)." *Id.* (emphasis added). The *Mosley* factors are not typically used to review a case like this one, where the motion for mistrial was raised in the punishment stage following the untimely disclosure of Article 39.14(h) evidence during that stage. And it is perhaps no wonder that they are not used, as *Mosley*'s second factor—the measures adopted to cure the misconduct—is entirely inapplicable here because the complained-of evidence was not provided until the punishment stage, thus making any cure impossible.

Instead of utilizing the *Mosley* factors, the issue of whether the trial court abused its discretion by denying Hallman's motion for mistrial is best addressed by determining whether the State's violation of Article 39.14(h) affected Hallman's substantial rights—essentially, a harm analysis under Texas Rule of Appellate Procedure 44.2(b). *See* Tex. R. App. P. 44.2(b). This approach is consistent with our recent opinion in *Sopko v. State*, 637 S.W.3d 252 (Tex. App.—Fort Worth 2021, no pet.), where we held that a harm analysis under Rule 44.2(b) was necessary to address a statutory violation of Article 39.14. This approach also squares with how some of our sister courts have addressed violations of Article 39.14. *See Williamson v. State*, No. 04-20-00268-CR, 2021 WL 4976326, at \*3 (Tex. App.—San Antonio Oct. 27, 2021, no pet.) (mem. op., not designated for publication) ("Violations of statutory duties under [A]rticle 39.14 of the Texas Code of Criminal Procedure warrant a harm analysis."); *Perkins v. State*, No. 03-19-00356-CR, 2021 WL 2172547, at \*3 (Tex.

5

App.—Austin May 28, 2021, no pet.) (mem. op., not designated for publication) ("Reviewing courts must conduct a harm analysis before determining whether reversal is proper for violation of [A]rticle 39.14.").

This analysis is still consistent with *Hawkins*, where the Texas Court of Criminal Appeals cautioned that "[a] harm analysis is employed only when there is error, and ordinarily, error occurs only when the trial court makes a mistake" but also acknowledged that "whether a mistrial should have been granted involves most, if not all, of the same considerations that attend a harm analysis." 135 S.W.3d at 76–77. And, applying a Rule 44.2(b) harm analysis cuts to the heart of the issue—the impact of the State's failure to timely disclose the complained-of thirteen pages—better than applying the *Mosley* factors.[2]

While applying a Rule 44.2(b) harm analysis appears to be the appropriate method for analyzing Hallman's issue on appeal, I will analyze the issue under both the *Mosley* factors and Rule 44.2(b). Regardless of which analysis is used, I conclude that the trial court did not abuse its discretion by denying Hallman's motion for mistrial.

---

[2]Rule 44.2(b) is not limited to addressing "errors"—the Rule expressly states, "Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Tex. R. App. P. 44.2(b).

# III. ANALYSIS UNDER *MOSLEY*

As noted above, the majority applied the three *Mosley* factors to assess whether the trial court abused its discretion by denying Hallman's motion for mistrial. I will address these factors in turn.

## A. The Severity of the Misconduct

Prejudicial effect is the touchstone of the first *Mosley* factor. *Hawkins*, 135 S.W.3d at 77; *West v. State*, No. 02-18-00109-CR, 2019 WL 3491937, at *2 (Tex. App.—Fort Worth Aug. 1, 2019, no pet.) (mem. op., not designated for publication). Thus, to analyze the severity of the misconduct present here, one must assess the prejudicial effect of the complained-of thirteen pages, which include the following: (1) Detective Robles's affidavit, (2) Hallman's handwritten statement, (3) Kim's handwritten statement, and (4) a family-violence packet.

### 1. The Prejudicial Effect of Detective Robles's Affidavit

Detective Robles's affidavit is a one-page document in which he describes what occurred during the August 10, 2014 incident. As noted by the majority, "Detective Robles's affidavit contained the same information as his offense report." Indeed, Detective Robles's affidavit is a near-verbatim repeat of the information contained in his offense report. Notably, the offense report was disclosed to Hallman during pretrial discovery. Thus, because the substance of the information contained in Detective Robles's affidavit is the same as the substance of the information contained in the offense report, the untimely disclosure of Detective Robles's affidavit had no

7

prejudicial effect. *See Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000) (holding that because information contained in undisclosed pathologist's report was materially the same as information contained in witness's testimony, there was "no reasonable probability that, had the [pathologist's report] been disclosed to the defense, the outcome of the proceeding would have been different").

## 2. The Prejudicial Effect of Hallman's Handwritten Statement

Hallman's handwritten statement is a one-page document in which he describes what occurred during the August 10, 2014 incident. In his statement, Hallman describes that he went to his neighbor's house to wait on his sister to pick Amy and him up; that Kim followed Amy and him to the neighbor's house; that Kim grabbed Amy and him; that Amy began having an asthma attack and said she could not breathe; that he pulled Kim off Amy; that Ron bit him; and that Ron was unintentionally bumped in the process. The information contained in the offense report—which was disclosed to Hallman in pretrial discovery—contains materially the same information as that contained in Hallman's handwritten statement. The offense report describes how Hallman told officers that he was going to his neighbor's house to call his sister to come and pick him up; that Amy wanted to leave with him and followed him; that Kim grabbed him and tried to get his phone out of his pocket; that Kim grabbed Amy; that Amy told Hallman that she could not breathe; that Hallman grabbed Kim to try and pull her away from Amy; that Ron bit him; and that he did not hit Ron unless it was by accident.

8

Because the substance of the information contained in Hallman's handwritten statement is the same as the substance of the information contained in the offense report (neither of which mentions any allegation of sexual abuse), the untimely disclosure of Hallman's handwritten statement had no prejudicial effect. *See id.* Moreover, there cannot be any prejudicial effect stemming from the untimely disclosure of Hallman's handwritten statement because Hallman made the statement and was thus aware of its contents.[3] *See Havard v. State*, 800 S.W.2d 195, 204 (Tex. Crim. App. 1989) ("[A]ppellant knew of both the existence and the content of his statement, as a matter of simple logic, because he was there when it was made."); *see also Garcia v. State*, No. 13-15-00527-CR, 2017 WL 3530926, at \*3 (Tex. App.—Corpus Christi–Edinburg Aug. 17, 2017, no pet.) (mem. op., not designated for publication) ("[A]ppellant's complaint relates to the disclosure of information already known to appellant—his own statement to law enforcement. The State has no affirmative duty to disclose information already known to a defendant.").

### 3. The Prejudicial Effect of Kim's Handwritten Statement

Kim's handwritten statement is a one-page document containing approximately four sentences in which she describes what occurred during the August 10, 2014 incident. In her statement, Kim describes Amy trying to leave with Hallman to go to

---

[3]The offense report also mentioned that Hallman "was given his chance to write his statement," which should have alerted Hallman and his counsel to the potential existence of Hallman's handwritten statement.

9

his sister's house to smoke marijuana; Kim refusing to let Amy go; Hallman telling Amy to run away; Kim going to the neighbor's house and taking Amy by the arm and trying to pull her back; Hallman hitting Kim in the right arm and twisting her arms behind her back; Ron biting Hallman; and Hallman hitting Ron in the face and stomach.

Hallman takes issue with the untimely disclosure of Kim's handwritten statement because while Kim testified that she had told police officers during the August 10, 2014 incident that she suspected Hallman of sexually abusing Amy, Kim's handwritten statement does not mention sexual abuse. Hallman contends that he would have impeached Kim with her handwritten statement if it had been timely disclosed. And, according to the majority, "there was no better evidence with which to impeach Kim's testimony about her sexual-abuse suspicions than her own written words." I disagree.

The credibility of Kim's statement that she had told police officers during the August 10, 2014 incident that she suspected Hallman of sexually abusing Amy was already called into question through the testimony of Detective Robles. Detective Robles specifically testified that Kim "never said anything" to him regarding her concern that one of her children was being sexually abused. Detective Robles further testified that there was no mention to Officer Oakley—another officer at the scene on August 10, 2014—regarding any concern that one of Kim's children was being sexually abused. If Kim had mentioned any concerns about sexual abuse of her

10

children, Detective Robles said that he "would have investigated further." Detective Robles also testified that he had not been trained in how to interview children about sexual abuse and that it would not have been appropriate for him to "have gone over to any of the children involved in this case and start[ ] asking about where [Hallman] had touched them."

Any gap between the potential value of attacking Kim's credibility through her handwritten statement and the value of attacking Kim's credibility through Detective Robles's testimony is minimal. If anything, Detective Robles's testimony is better impeachment evidence than Kim's handwritten statement because his testimony actually contradicts Kim's testimony that she had told police officers about her suspicions of sexual abuse, while Kim's handwritten statement is merely silent on the issue.[4] Moreover, the information contained in Kim's handwritten statement is substantially similar to the information contained in the offense report regarding what Kim told police officers on August 10, 2014. The information in the offense report—which was disclosed during pretrial discovery—does not mention that Kim told police officers about her suspicion of Hallman's sexual abuse. Hallman could have attacked

_____

[4]The majority states that "while Kim claimed at trial that on August 10, 2014, she had told the police that she suspected Hallman was sexually abusing Amy, her own written statement clearly demonstrates otherwise." This conclusion goes too far. Just because Kim's handwritten statement, which spans just a handful of sentences, does not mention her report of sexual abuse to police officers on August 10, 2014, that does not "clearly demonstrate" that she did not voice her suspicions to police.

11

Kim's credibility with the offense report in almost exactly the same way that he could have attacked her credibility with her handwritten statement.

Finally, to the extent that Kim's handwritten statement could have been valuable in attacking her credibility in ways that could not have been done through Detective Robles's testimony or the disclosed offense report, that value is minimal when understood in the context of the entire case. First, this extraneous incident occurred over a year and a half before the first outcry in this case. Second, it involved Hallman's assaulting Kim and Ron, not his sexually assaulting the complainants.[5] Third, Kim is just one witness among many, and as I explain below, there is substantial evidence to support Hallman's conviction. There is no rational explanation for how Hallman's potential cross-examination of Kim with her handwritten statement would be the proverbial "straw that broke the camel's back."

### 4. The Prejudicial Effect of the Family-Violence Packet

The family-violence packet contains a few pages of information relating to the August 10, 2014 incident and was filled out by Officer Oakley, one of the police

---

[5]Indeed, it was the credibility of the complainants that was emphasized by the State in its opening statement: "[Y]our job is to weigh the credibility of these girls. . . . After you hear from all of the evidence, all of the witnesses in this case, it comes down to the girls. And you're going to weigh whether or not you believe them." The emphasis on the credibility of the complainants continued in closing argument when the State said, "These are the kinds of cases, these child sexual abuse cases comes down to do you believe them or not. . . . Today is the opportunity that you can tell them that despite what happened to them in 2010, 2011, 2012, 2013, '14, '15 and '16, that today, we believe you."

officers responding to the August 10, 2014 incident. Hallman complains about the untimely disclosure of the family-violence packet, arguing that he would have used the family-violence packet to attack Kim's credibility during the guilt–innocence stage of the trial.

Hallman points to two checklists in the family-violence packet, one titled "Condition of Victim Upon Officer Arrival" and the other titled "Description of Incident," arguing that he would have attacked Kim's credibility with the fact that Officer Oakley did not check the box for "Sexual Assault" on either checklist. However, Kim's credibility could not be effectively attacked through this evidence because the checklist relating to the condition of the victim (i.e., the condition of Kim and Ron) would not capture any report of sexual assault against Amy, nor would the checklist relating to the description of the incident (i.e., the physical assault on August 10, 2014, not a prior sexual assault) capture a report of sexual assault.

Hallman also notes that the checklist titled "Description of Incident" contains boxes for "Threat of Retaliation" and "Threat of Physical Violence" and that those boxes were unchecked. Hallman argues that he would have attacked Kim's credibility with this evidence because Kim had testified that Hallman had once stated that he would "kill all of us" if he ever went to jail. Once again, this does not explain how Kim's credibility would be effectively attacked through this evidence because that checklist related to the description of the August 10, 2014 incident, which did not involve any threats of retaliation or threats of physical violence.

13

Hallman also points to a checklist titled "Demeanor on scene," which contains a checked box for "Calm" to reflect the respective demeanors of Rita, Amy, and Kelly (another daughter of Hallman's) during the August 10, 2014 incident. Hallman argues that he would have used this evidence to attack Kim's credibility because she had testified that Amy and Kelly had been upset during the August 10, 2014 incident. Again, I do not see how Kim's credibility would be effectively attacked through this evidence. The alleged discrepancy can be easily explained as the children being calm during one part of the incident and upset during another. This explanation gains credence because the offense report noted that Amy "got upset" when asked by police for further details of the incident. Moreover, any discrepancy between Kim's testimony and the checklist regarding the children's demeanor during the August 10, 2014 incident does not undermine the substantial testimony detailing Hallman's sexual abuse of Amy.

And while I do not see how the timely disclosure of the family-violence packet would have any value in attacking Kim's credibility, to the extent that it does contain some value, the offense report contains much of the same information as the family-violence packet. Much like the family-violence packet, the offense report does not mention sexual abuse nor does it mention threats of physical violence. Hallman could

14

have attacked Kim's credibility with the offense report in much the same way that he could have attacked her credibility with the family-violence packet.[6]

### 5. Summary of the Prejudicial Effect of the Complained-Of Evidence

In sum, I do not think that the untimely disclosure of the complained-of evidence had a prejudicial effect on Hallman. *See Hawkins*, 135 S.W.3d at 77; *West*, 2019 WL 3491937, at *2. Much of the information contained in the complained-of evidence was also contained in the timely-disclosed offense report. Hallman had other means to attack Kim's credibility outside of the complained-of evidence—most notably through Detective Robles's testimony and the offense report—and any value that Hallman could have gained by using the complained-of evidence was de minimis. The first *Mosley* factor weighs against Hallman.

## B. The Measures Adopted to Cure the Misconduct

The second *Mosley* factor—the measures adopted to cure the misconduct— does not appear applicable here, and the parties evidently agree. In Hallman's brief on remand, he states, "The second factor, curative measures, is inapplicable since there were none. The evidence was not revealed until the damage was done and the verdict returned." In the State's brief on remand, the State notes, "[B]ecause the only relief requested was a motion for mistrial, which was denied by the trial court, consideration of the second factor—measures adopted to cure the misconduct—is

---

[6]Notably, the offense report mentioned that "[t]he Family Violence Packet was completed." That reference, like the one to Hallman's statement, should have put Hallman and his counsel on notice of the existence of the family-violence packet.

15

largely irrelevant. As such, the State will focus on the first and third factors of the *Mosley* test."

Despite the parties' lack of emphasis on the second *Mosley* factor, the majority states that this factor "weigh[s] heavily in favor of a mistrial." According to the majority, this is so because "nothing in the record before us reflects that the elected judge in this case took any steps to mitigate the harm from the belated disclosure or to familiarize herself with the guilt–innocence proceedings." This reasoning fails for two reasons. First, because the complained-of evidence was not provided to Hallman until the punishment stage, there was nothing for the trial court to cure. The trial court could not go back to the guilt–innocence stage—it could only either grant Hallman's motion for mistrial or deny it.[7]

Second, I fail to see how any failure on the trial court's part to properly familiarize itself with the guilt–innocence proceedings would have had any impact on the trial court's ability to cure the untimely disclosure of the complained-of evidence. The trial court could have spent several days reading the trial transcript and reviewing every exhibit admitted, but that would not change the fact that the trial court could not go back to the guilt–innocence stage. As such, the second *Mosley* factor is either

---

[7]The majority seemingly recognizes that there was nothing for the trial court to cure, noting that "a continuance to assess the evidence's use was too late and any subsequent cross-examination of Kim using that impeachment evidence would have been pointless."

inapplicable or neutral to the determination of whether the trial court abused its discretion by denying Hallman's motion for mistrial.

## C. The Certainty of Conviction Absent the Misconduct

The third *Mosley* factor—the certainty of conviction absent the misconduct—is measured by looking at the strength of the evidence supporting the conviction. *Archie*, 221 S.W.3d at 700; *Mosley*, 983 S.W.2d at 259. In holding that Hallman's conviction was not certain absent the untimely disclosure of the complained-of evidence, the majority describes this appeal as a "classic he-said, she-said" case and focuses on "the curious timing of Rita's and Amy's delayed outcries, the filing of Kim's May 2016 divorce petition, in which Kim did not mention any alleged sexual abuse, and some of the discrepancies in her testimony."

However, the majority's analysis largely ignores the strength of the evidence supporting Hallman's conviction. And I would not describe this as a "classic he-said, she-said" case. Twelve witnesses testified during the guilt–innocence stage of Hallman's trial. Thus, I would describe this case as a "she-said, he-said, he-said, she-said, she-said, he-said, she-said, she-said, she-said, he-said, he-said, she-said case."

The majority does a fine job of taking on the herculean task of detailing the testimony from these twelve witnesses, and I will not belabor the issue by once again detailing all of their testimony. I will, however, briefly summarize some of the pertinent testimony to assess the strength of the evidence supporting Hallman's conviction.

- Amy's Testimony: Amy, who was eighteen at the time of trial, testified about being sexually assaulted by Hallman on numerous occasions, and she gave detailed, sensory accounts of the sexual assaults. She testified that when she was in the seventh or eighth grade, Hallman, Rita, and she had played a game called "butt plugs" where Hallman ended up pulling down the girls' pants and putting his hand between their buttocks. She also testified that when she was "[p]robably about 12," Hallman had pulled down her school uniform and put his mouth on her vagina. After Amy pushed Hallman's head away, he pulled his pants down and inserted his penis into her vagina. Amy testified about occasions "in the computer room" when Hallman had made her perform oral sex on him and testified about occasions when Hallman would make her touch his penis while he was "looking at inappropriate things on his phone." She also testified that when she had stayed with Hallman at a hotel for a couple of months when she was sixteen, she awoke to Hallman on top of her, "trying to stick his penis into [her] vagina." Amy testified that the abuse occurred "just about on a day-to-day basis" from 2012 through 2016, and included finger-to-vagina contact, mouth-to-vagina contact, penis-to-vagina contact, hand-to-penis contact, mouth-to-penis contact, hand-to-breast contact, and mouth-to-breast contact. Amy also testified that she had seen Hallman "cree[p]" into the bedroom that she shared with Rita, saw him get into Rita's bed, and saw his hands moving around Rita.

18

- Rita's Testimony: Rita, who was twenty at the time of trial, testified that she had never witnessed Hallman touch Amy in a sexual manner. Rita, however, testified that "when me or my sister wanted something from [Hallman], he would always . . . tell us to do things . . . to him, or we had to let him see one of our private parts if we wanted something like clothes or shoes or anything." Rita also testified that "[a]t nighttime, [Hallman] would come into [her] room, and he would stick his hand in [her pants] and play with [her] vagina"—testimony that largely mirrored Amy's description of Hallman's abuse of Rita.

- Kim's Testimony: Kim testified that Hallman bought Amy and Rita lingerie and that she thought it was inappropriate. She also testified that Hallman "would have [Amy] outside in the truck with him . . . late at night on school nights" and that Amy would be wearing "just her robe to get in the truck with him." Kim also described how when Hallman and Amy spent the night at Hallman's sister's house, Amy would sleep in the same room as Hallman. Kim testified that Hallman treated Amy "more like his wife" than his daughter. Kim also testified about an occasion when she confronted Hallman with an allegation that he had asked Rita to rub Vaseline on his penis, and Hallman told Kim that "[h]e thought that his 12-year old daughter [Rita] was actually [Kim]."

- Theresa Fugate's Testimony: Theresa Fugate, a sexual assault nurse examiner who had conducted a sexual assault exam on Amy and Rita, testified that Amy told

19

her that Hallman had started sexually abusing her when she was twelve years old and that the abuse included penis-to-vagina contact, finger-to-vagina contact, mouth-to-vagina contact, and hand-to-penis contact. Fugate also testified that Rita had told her about the incident when Hallman had asked Rita to rub Vaseline on his penis. Rita also relayed to Fugate instances when Hallman had come into Rita's room at night and touched her vagina.

- Samantha Torrance's Testimony: Samantha Torrance, who had conducted forensic interviews of Amy and Rita, testified that she did not have any concerns that Amy or Rita had been coached. Torrance testified that Amy had made an outcry of sexual abuse to her and that Amy disclosed peripheral and sensory details to her. Torrance likewise testified that Rita had made an outcry of sexual abuse to her and that Rita had also disclosed peripheral and sensory details to her. Notably, Torrance testified that "[i]t's not very common that a kid gets sexually abused one time and immediately tells. It's more common that they might kind of test the waters a little bit and see how people are going to react. They might deny it for a really long time at first . . . ."

- Detective Jonathan McKee's Testimony: Detective McKee, who was assigned to Hallman's case following Rita's outcry, testified that "children decide to disclose their abuse when they're ready to talk about it. And a lot of times that's not right

away." Detective McKee also testified that Amy had talked about being sexually abused in a hotel.

In sum, there is a substantial amount of evidence from various witnesses, including the complainants, tending to prove that Hallman had sexually abused Amy. This factor weighs heavily against Hallman.[8] *See Archie*, 221 S.W.3d at 700; *Mosley*, 983 S.W.2d at 259.

### D.  Summary of the Analysis under *Mosley*

After applying the *Mosley* factors, I have concluded that the first factor weighs against Hallman, the second factor is either inapplicable or neutral, and the third factor weighs heavily against Hallman.  As such, to the extent that the *Mosley* factors are appropriate to address Hallman's argument on appeal, I would hold that the trial court did not abuse its discretion by denying Hallman's motion for new trial, and I would overrule Hallman's sole point of error.  *See Mosley*, 983 S.W.2d at 259.

### IV.  ANALYSIS UNDER RULE 44.2(b)

As discussed above, I think that the correct way to analyze Hallman's argument on appeal is to ascertain whether the State's violation of Article 39.14(h) violated Hallman's substantial rights.  *See* Tex. R. App. P. 44.2(b).

---

[8]While the majority emphasizes the "curious timing of Rita's and Amy's delayed outcries," the record reflects that children often delay outcries of sexual abuse and "test the waters a little bit and see how people are going to react."

An error that has a "substantial and injurious effect or influence in determining the jury's verdict" affects a substantial right. *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). In determining the likelihood that a nonconstitutional error adversely affected the jury's decision, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

Because there is significant overlap between the analysis of the *Mosley* factors and the harm analysis under Rule 44.2(b), I will not belabor the point by repeating what I said above. It suffices to say that there is substantial evidence tending to prove that Hallman sexually assaulted Amy. Most notably, there is testimony from Amy herself, who was eighteen at the time of trial, and who testified at length about being sexually assaulted by Hallman on numerous occasions and gave detailed, sensory accounts of those assaults.

22

If the complained-of evidence had been timely produced, it would have had nothing more than a "slight effect" on the jury. *See Solomon*, 49 S.W.3d at 365; *Johnson*, 967 S.W.2d at 417. In this regard, much of the information contained in the complained-of evidence was also contained in the offense report. *See Wyatt*, 23 S.W.3d at 27. Moreover, Hallman had other means to attack Kim's credibility outside of the complained-of evidence, including through Detective Robles's testimony and through the information contained in the offense report.[9] Finally, to the extent that there is any value to the complained-of evidence, that value would be only slight. The complained-of evidence could have been used to do nothing more than attack Kim's credibility as to her testimony about what occurred during the August 10, 2014 incident; but that testimony does virtually nothing to assail the evidence relating to Hallman's sexual assault of Amy, particularly in light of Amy's detailed testimony relating to Hallman's abuse.

In sum, I do not believe that the untimely disclosure of the complained-of evidence affected Hallman's substantial rights. *See* Tex. R. App. P. 44.2(b). As such, to the extent that Rule 44.2(b) is appropriate to address Hallman's argument on appeal, I would hold that Hallman's substantial rights were not affected, and I would overrule Hallman's sole point of error. *See id.*

---

[9]Moreover, Hallman and his counsel should have been aware of Hallman's handwritten statement and the family-violence packet because both were referenced in the offense report.

## V. CONCLUSION

Because I would hold that the trial court did not abuse its discretion by denying Hallman's motion for mistrial and that Hallman's substantial rights were not affected, I would affirm the trial court's judgment. Because the majority holds otherwise, I respectfully dissent.

/s/ Dana Womack

Dana Womack
Justice

Publish

Delivered: June 16, 2022

24